N. B. TRULOCK *et al* v. J. R. BLAIR.

(Filed June 15, 1899.)

STATUTE OF FRAUDS—*Promise to Pay Debt of Another.* Wherever the leading purpose of a person who agrees to pay the debt of another is to gain some advantage or promote some interest or purpose of his own, and not to become a mere guarantor or surety of another's debt, and the promise is made upon sufficient consideration, it will be valid, although not in writing, and the contract is not within the statute of frauds.

(Syllabus by the Court.)

*Error from the District Court of Canadian County; before John C. Tarsney, District Judge.*

*W. H. Criley,* for plaintiff in error.

*T. G. Chambers,* for defendant in error.

Action by N. B. Trulock and others, as the El Reno Ice & Coal company, against J. R. Blair. From an order sustaining a demurrer to plaintiff's evidence they bring error. Reversed.

### STATEMENT OF THE CASE.

This was an action for the recovery of an amount due for a quantity of ice shipped by the plaintiffs to one McCormick, and, as was alleged by the plaintiffs, upon the order and credit of the defendant, Blair. The cause comes here on error from an order of the court sustaining a demurrer to the plaintiffs' evidence. The plaintiffs were manufacturers of ice at El Reno. The defendant lived in Oklahoma City, and was a wholesale dealer in beer at that place and at Shawnee. He had in his employment at Shawnee a man named McCormick. In July, 1895, the defendant, Blair, requested the plaintiffs to ship their ice to McCormick, saying at the time: "I will see that the financial part is all right; I will see that the accounts are paid." One car of ice was shipped to McCormick under this arrangement, and paid for, except the sum of $10. On July 29, 1895, the defendant wired to the plaintiffs to "send car load of ice to McCormick at once; about out. J. R. Blair;" and by another telegram, on the same day, "Will you load car of ice to McCormick to-day?" On August 6th the defendant wrote to the plaintiffs as follows:

"OKLAHOMA CITY, August 6, 1895.

"El Reno Ice & Coal Co., El Reno, O. T.—Gents:

"Please let me know when you will be able to ship Shawnee ice. It is very important that I should know exactly, as I have a hard time to get ice here. I have kept Mac in ice so far, and he still holds the trade, but the Anheuser folks are doing everything to get a holt before you can get ice in. Ship as soon as you possibly can, and we will have that trade. Please answer by return mail, or wire me, at my expense, as soon as you get this. J. R. BLAIR."

The plaintiffs failed to ship the ice, and on August 10th Blair visited the plaintiffs at their plant in El Reno, and in conversation with Bradford, a member of the El Reno Ice company, said to him, "I do not understand why you do not send the ice where I ordered it." Bradford replied that it took several days to produce ice after a breakdown, which had occurred in the plant. Blair then said, "I want you to send him (meaning McCormick) the very first ice you turn out,—the first order you fill;" and further said, "Do you hesitate on account that you think you may not get your money?" Bradford replied that they did not hestitate, because they looked to him (Blair) for their money, and Blair then said, "You ship McCormick the first car of ice you turn out and I will see that it is paid for;" and, further, that "if this car is not paid for, and another car is ordered, don't be afraid to ship that; send it right on; and I will see that you are paid the money." Afterwards, in September, two cars of ice shipped to McCormick, under this direction of Blair, remained unpaid for; the ice company refused to ship any further ice to the direction of McCormick; and, in a conversation with Blair, Bradford said to him that the plaintiff would continue to ship the ice if the bills of lading in the future should read to him (J. R. Blair.) Blair said that he would "go to Shawnee, and have those two cars transferred to my account, and I will send you a check to-morrow for them;" and Bradford said, "I will have the account in the books changed to J. R. Blair." Blair replied, "No; leave the account on there to W. H. McCormick, and I will send you a check for the amount."

The evidence showed that McCormick was engaged in the business of selling beer in Shawnee for J. R. Blair,

and that the ice was used to cool the beer, the property of Blair. It appeared from the testimony of R. S. Trulock, secretary and treasurer of the ice company, that the conversation had occurred in El Reno as stated by Bradford, and that Blair had reiterated that, if McCormick ordered any more cars, he wanted the plaintiffs to ship them, and "I will see that you get your money;" that his beer was spoiling in Shawnee, and that it was necessary for him to have the ice over there. Trulock said to him that they considered him (Blair) perfectly good, and that they did not know McCormick. Bradford also testified that the ice had been shipped to McCormick "just from the conversation I had with Mr. Blair on the train going down to Shawnee," and that "I gave credit to Mr. Blair because I didn't know McCormick at all, or anything about his financial condition," and that he would not have shipped the ice to McCormick without the arrangement made with Blair. It was again testified by Bradford that when Blair came over to El Reno in August, and saw the witness at the ice plant, he (Bradford) told him (Blair) that they looked to him for the payment of the account, and that Blair replied that it was "all right, and the account would be paid," and that, "if the car wasn't paid for when another was ordered, to ship the next car of ice just the same." The ice sued for was thus shipped to McCormick, and an account opened in his name, at the request of Blair, and upon his express promise to pay for all the ice that was ordered by McCormick. At the close of the season for shipping ice for 1895, $114.80 remained unpaid upon the account. In the winter, and when the ice factory had

closed down for the season, and upon an occasion when the account was presented to Blair and payment demanded, "he just said that he would not pay it. He said that he would have been a fool to guarantee McCormick's account, and that McCormick had quit him now and left his employ, and that he could not get even with him, and that he was a fool to say that he would assist to pay it in any way."

The case was brought in the probate court, and judgment rendered for the plaintiff for the amount sued for. The defendant appealed to the district court, where the case was heard, and the evidence herein cited was produced. The court sustained a demurrer to the evidence, which is assigned as error.

Opinion of the court by

McATEE, J.: For the purposes of the demurrer the truthfulness of all this testimony is conceded. We presume that the judgment below was rendered upon the supposition that, inasmuch as the goods were charged on the books of the company to McCormick, the debt was the debt of McCormick, and the promises made by Blair, and his liability, if any, were collateral, and to pay the debt of another, and therefore not binding. But the fact that the goods were charged on the books of the company to McCormick was only evidence tending to show that the credit was given to McCormick, and was by no means conclusive. It was a fact open to explanation, and to be considered in connection with all the other testimoy offered by the plaintiffs, in order to determine to whom the credit was given. The ice was ordered by Blair upon the express promise that he would pay for it. McCormick was his employe in the

business of selling beer, and the ice was ordered for the purpose of preserving the beer from spoiling, and the beer was Blair's. The credit was given upon Blair's account alone, as shown by this testimony, and was entered to the account of McCormick, in order to oblige Blair, and upon his own request. The plaintiffs had no knowledge of McCormick, did not know his financial condition, and gave no credit to him. The evidence shows that the credit was extended exclusively to Blair. The fact that the account was entered in the name of McCormick did not necessarily imply that any credit was given to him at all. Under the evidence in this case, we think it may be properly said that the only presumption which arises from that fact was that, inasmuch as Blair requested that the account should be kept in the name of McCormick, he made the request for the purpose of keeping his own account with McCormick clear. Upon this state of facts, the judgment should have been for the plaintiffs. The conclusion upon this evidence must be that the contract was an original contract with Blair, and that the promises made were not collateral to any agreement of the plaintiff company with McCormick. (*Calahan v. Ward*, 45 Kan. 545, 26 Pac. 53; *Burkhalter v. Farmer*, 5 Kan. 289; *Amort v. Christofferson* [Minn.] 59 N. W. 304; *Maurin v. Fogelberg* [Minn.] 32 N. W. 858.)

The object of the order for the ice made by Blair; the purpose for which it was used, and for which he wanted it and for which he ordered it, which was for his own benefit; the persistence with which he ordered it by telegram; by letter, and by visits to El Reno; and the application of the ice to the preservation of

his stock of beer,—clearly manifest that the sole purpose of Blair was his own private benefit, not the benefit of McCormick; and wherever the leading purpose of a person who agrees to pay the debt of another is to gain some advantage or promote some interest or purpose of his own, and not to become a mere guarantor or surety for another's debt, and the promise is made upon a sufficient consideration, it will be valid, although not in writing, and the contract is not within the statute of frauds. (*Fitzgerald v. Morrissey*, [Neb.] 15 N. W. 234; *Clopper v. Poland*, 12 Neb. 69, 10 N. W. 538; *Nelson v. Boynton*, 3 Metc. [Mass.] 396.)

The judgment of the court below will be reversed, and a new trial awarded to the plaintiffs in error.

All of the Justices concurring.